IN THE UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF FLORIDA, PENSACOLA DIVISION

GARY B. LEUCHTMAN, as personal representative )
    of the estate Paris Browder, a deceased minor )
JESSICA DOUGLAS, parent of Paris Browder )
WILLIAM BROWDER, parent of Paris Browder )
PENELOPE BROWDER, sister of Paris Browder, )
    by and through her parents and next friends, )
    Jessica Douglas and William Browder )
     )
    Plaintiffs ) Jury Trial Demanded
     )
v. ) Case No. _____
     )
FISHER-PRICE INC. )
MATTEL INC. )
DIRT CHEAP L.L.C. )
     )
    Defendants )

## COMPLAINT

Comes now the plaintiff, Gary B. Leuchtman, as personal representative of

the estate of Paris Browder, a deceased minor, as well as her parents and sister,

Jessica Douglas, William Browder, and Penelope Browder, who allege the following

facts, assert the following claims, and demand the following damages from the

defendants: (1) Fisher-Price Inc. ("Fisher"), (2) Mattel Inc. ("Mattel"), and (3) Dirt

Cheap L.L.C. ("Dirt").

## Introduction

1. This is a civil wrongful death product liability action for damages arising

under both Florida and federal substantive law. Five-and-a-half month old Paris died

from positional asphyxia due to a defective and unreasonably dangerous infant seat, the "Fisher-Price Rock'n Play Sleeper" (hereafter the "Rock'n-Play"), which Fisher and Mattel designed, manufactured, assembled, tested, inspected, marketed, distributed, and/or sold throughout the U.S. and the world for ten years as a product that was allegedly suitable for safe infant sleep, including prolonged and overnight sleep when inclined sleepers such as the Rock'n-Play are unsuitable for infant sleep, dangerous, and deadly.

2. The Rock'n-Play was recalled twice by the Consumer Product Safety Commission ("CPSC"). Specifically, on April 12, 2019, Fisher and Mattel were forced to recall the 4.7 million Rock'n-Plays in the U.S. and cease selling the product. After the April 2019 recall announcement, more than 60 additional infant fatalities, all of which occurred before the announcement, were reported.

3. Despite knowing that babies were dying, Fisher and Mattel engaged in a negligent, lackluster, and perfunctory effort to recall the products and notify the public of the danger. Because of the negligent and reckless manner in which the recall was conducted by Fisher and Mattel, at least 8 additional infant fatalities occurred after the April 2019 recall was announced, including Paris, who died two years later on April 21, 2021.

4. Thus, the manufacturers (Fisher and Mattel) not only defectively designed the product and insufficiently warned about the danger to infants, but they also

botched the recall, causing Paris's death. On January 23, 2021, the third defendant (Dirt), one of the country's largest retailers, knowingly sold the product <u>new</u> for Paris's use -- despite it having been subject to a mandatory CPSC recall for nearly two years. This combined with the wrongful conduct of Fisher and Mattel to cause Paris's death.

Jurisdiction and Venue

5. This Court has federal question jurisdiction pursuant to 28 U.S.C. § 1331 over count 4, which asserts claims against Dirt under the Consumer Product Safety Act, 15 U.S.C. §§ 2051, et seq. ("CPSA") and specifically § 2072. Plaintiffs seek more than $10,000.00 in damages, exclusive of interest and costs.

6. This Court has supplemental federal jurisdiction pursuant to 28 U.S.C. § 1367(a) over counts 1, 2, and 3, which assert wrongful death claims against all three defendants under Florida law. In addition and in the alternative, this Court has diversity jurisdiction over Counts 1, 2, and 3 pursuant to 28 U.S.C. § 1332(a)(1) because the parties have complete diverse citizenship and Leuchtman seeks more than $75,000.00 in damages, exclusive of interest and costs.

7. Venue is proper in this district and division pursuant to 28 U.S.C. § 1391(b)(1)-(2),(c)(2) because a substantial part of the events giving rise to the claims occurred within this district and division, and all three defendants reside in this division and district under the meaning of these statutes.

<u>Parties</u>

8. The plaintiff, Gary B. Leuchtman, is an adult resident and citizen of Florida, who was appointed the successor personal representative of Paris Browder, a deceased minor, on April 6, 2023 by the Probate Division of the Circuit Court of Escambia County, Florida, Case No. 2023-CP-000219. He brings counts 1 through 4 for the benefit of Paris's estate and the beneficiaries of her estate. The estate seeks to recover funeral, burial, medical and other expenses resulting from the death.

9. The potential beneficiaries of Paris's estate (and additional plaintiffs) are her parents, Jessica Douglas and William Browder, and her older sister, Penelope Browder. All three are resident citizens of Escambia County. They loved Paris and are injured and damaged through the emotional distress and loss of consortium they suffered, and continue to suffer, as a result of her death. They also lost her future support and services.

10. Fisher is a Delaware corporation with its principal place of business in New York. Fisher designs, manufactures, distributes, markets, advertises, labels, and sells products for the care of infants and preschool children throughout the U.S., including Florida, including the Rock'n-Play.

11. Fisher is a wholly-owned subsidiary of Mattel. Mattel is a Delaware corporation with its principal place of business in California. Mattel is the world's

second largest toy maker. On its annual filings with the Securities Exchange Commission, Mattel references Fisher as a brand in "Mattel's portfolio of global brands." The website on which Fisher and Mattel advertised their Rock'n-Play includes Mattel's name, i.e. fisherprice.mattel.com.

12. Dirt is a Mississippi limited liability company. Its members are not Florida citizens. Dirt's website states it is "an extreme value retailer giving major brand customer returns and excess inventory a second chance." Dirt sold the Rock'n-Play that killed Paris in a new condition and in its original packaging.

13. A reference to "Defendants" includes all Fisher, Mattel, and Dirt. Defendants have purposefully availed themselves of the privilege of conducting business activities within Florida by placing their products, including the Rock'n-Play, into the stream of commerce by advertising their products in Florida, and establishing retail facilities within Florida.

14. Defendants derive substantial revenue from goods sold and used in Florida. Defendants reasonably expect, or should reasonably expect, that their business activities could or would have consequences within the Florida. Defendants have established continuous and systematic contacts with Florida sufficient to confer both specific and general jurisdiction.

<u>Statement of Facts</u>

15. The Rock'n-Play was extremely popular with parents and other caregivers. The Rock'n-Play was by far the best-selling "sleeper" on Amazon.com. Fisher and Mattel made enormous profits from their decade-long sale of Rock'n-Play and there were 4.7 million of them in homes with infants, as well as day care centers and elsewhere, across the U.S.

16. The Rock'n-Play is inherently unsafe as a sleeper and unfit for this intended use. The Rock'n-Play poses a number of serious safety risks that have led to many documented infant deaths and injuries. By positioning an infant at a 30-degree incline, the Rock'n-Play significantly increases the risk that the infant's head will slip into a dangerous position, tilt to constrict the windpipe, and/or cause the infant's face to become pressed against the padded fabric and block airflow, which the infant may be unable to correct. This increases the risk of death by asphyxiation. Moreover, the design of the Rock'n-Play can lull infants into a deeper sleep than normal sleep, making them less able to wake up if their airflow becomes obstructed, which also increases the likelihood of death by suffocation.

17. Fisher and Mattel knew of the American Academy of Pediatric's ("AAP") pronouncement that for babies to sleep safely, they must be placed flat on their backs on a firm flat surface with no bedding or bumpers. Yet, the Rock'n-Play has a 30-degree incline, a baby in it is not flat on his or her back, and there is soft padding around the baby.

18. Despite knowing that the Rock'n-Play is unsafe for infant sleep, including overnight or prolonged sleep, Fisher and Mattel marketed and sold the product as a sleeper, leading parents to reasonably believe that the product is safe for its stated purpose. The words "sleeper" and "sleep" appear at least five times on the package, which depicts pictures of a mom blissfully sleeping or about to fall asleep with the baby asleep in the Rock'n-Play. Those materials even prominently state, "Baby can sleep at a comfortable incline all night long!" However, the Rock'n-Play is not safe for sleep, including prolonged or overnight sleep.

19. Fisher and Mattel knew about these risks as long as they sold the Rock'n-Play. Among other things: (1) since long before the product was introduced to the market in 2009, the AAP and major consumer groups repeatedly issued warnings about the serious dangers of inclined sleepers; (2) due to these known dangers, in 2011, regulators in Canada and Australia did not allow Fisher and Mattel to sell the Rock'n-Play in their countries as a "sleeper"; (3) Fisher and Mattel were sued for at least one infant death in a Rock'n-Play and for product liability after an infant stopped breathing in the product; (4) according to Fisher and Mattel, at least 32 babies have been reported to have died using the Rock'n-Play; and (5) over 700 injuries have been reported due to the use of inclined sleepers, including the Rock'n-Play. Ignoring these documented safety concerns, Fisher and Mattel knowingly

marketed and sold the Rock'n-Play in the U.S. as an infant sleeper suitable for infant sleep, including prolonged or overnight sleep.

20. In fact, as set forth below, the Rock'n-Play is so inherently dangerous and has caused so many infant deaths that, on April 12, 2019, Fisher and Mattel, after making an incomplete disclosure on April 5, 2019, were forced to recall approximately 4.7 million Rock'n-Plays in the U.S. and cease selling the product.

21. On April 5, 2019, the CPSC and Fisher issued a statement acknowledging that ten infants had died while in the Rock'n-Play since 2015, and recommended and warned consumers to stop using the Rock'n-Play once the infant reaches three months of age, or as soon as the infant exhibits rollover capabilities. The news release stated, in relevant part:

> The [CPSC] and Fisher warn consumers about the Fisher Rock'n-Play due to reports of death when infants roll over in the product. According to medical literature, infants typically begin rollover behaviors at 3 months. The CPSC is aware of 10 infant deaths in the Rock'n-Play that have occurred since 2015, after the infants rolled from their back to their stomach or side, while unrestrained. All 10 infants were 3 months or older. Because deaths continue to occur, CPSC is recommending consumers stop use of the product by three months of age, or as soon as an infant exhibits rollover capabilities. CPSC has previously warned consumers to use restraints in infant inclined sleep products. Fisher warns consumers to stop using the product when infants can roll over, but the reported deaths show that some consumers are still using the product when infants are capable of rolling and without using the three point harness restraint. CPSC and Fisher remind consumers to create a safe sleep environment for infants, whether using a crib, bassinet, play yard, or inclined sleeper: Never add blankets, pillows, stuffed toys, or other items to the environment and always place infants to sleep on their

backs. The Commission voted to publish a finding that the health and safety of the public requires immediate notice.

22. Mattel issued a press release later in the day on April 5, 2019, shortly after the joint CPSC/Fisher announcement, which stated in relevant part:

> A child fatality is an unimaginable tragedy. Fisher has a long, proud tradition of prioritizing safety as the cornerstone of our mission. Generations of parents have trusted us for almost 90 years to provide safe products for their children. We are there with you from the moment you bring your child home and take our responsibility for product safety very seriously. Today, the [CPSC] and Fisher have jointly issued an alert warning parents and caregivers to discontinue use of the [Rock'n-Play] when infants begin to roll over. To ensure a safe sleep environment for infants, we remind parents and caregivers to follow all safety warnings included with the product: always use the provided restraints, always place infants on their backs to sleep, and make sure that no pillows, blankets or extra padding are placed in the [Rock'n-Play]. The [Rock'n-Play] meets all applicable safety standards, including those of the international standards organization, known as ASTM International, and is certified by the Juvenile Products Manufacturers Association (JPMA).

23. Despite admitting that ten babies died from the use of Fisher's and Mattel's product and issuing a warning to consumers, the general manager of Fisher (like Mattel) asserted on April 5, 2019 that the Rock'n-Play meets all safety standards.

24. On April 8, 2019, Consumer Reports published a lengthy article entitled "Fisher [Rock'n-Play] Should be Recalled, Consumer Reports Says." The article describes the results of Consumer Reports' investigation, which found the Rock'n-Play was tied to at least 32 infant deaths. Consumer Reports noted that the Rock'n-Play "has not been recalled by Fisher, part of the children's products giant Mattel,

which had about $4.5 billion in sales in 2018. The deaths prompted only warnings by the company and the CPSC, which does not have a mandatory safety standard for infant reclined sleep products." The article further noted that "the number of incidents associated with the Rock'n-Play, combined with long-standing expert medical advice that babies should sleep on firm, flat surfaces, raises serious safety concerns about the product."

25. The next day, on April 9, 2019, the AAP issued a press release calling on the CPSC to recall the Rock'n-Play and urging parents to stop using the Rock'n-Play immediately, stating in relevant part:

> AAP urges parents to stop using the product immediately. Stores should remove the [Rock'n-Play] from their shelves. A warning issued by the CPSC and Fisher on April 5 did not go far enough to ensure safety and protect infants, according to the AAP. "This product is deadly and should be recalled immediately," said Kyle Yasuda, MD, FAAP, president of the American Academy of Pediatrics. "When parents purchase a product for their baby or child, many assume that if it's being sold in a store, it must be safe to use. Tragically, that is not the case. There is convincing evidence that the [Rock'n-Play] puts infants' lives at risk, and CPSC must step up and take immediate action to remove it from stores and prevent further tragedies." Last week, the CPSC and manufacturer alerted consumers to stop using the product when the infant reaches 3 months of age or is capable of rolling over, citing 10 infant deaths that occurred in the Rock'n Play. The Consumer Reports article, published April 8, tied a total of 32 deaths to the Rock'n Play, including the 10 noted in last week's warning. Consumer Reports concluded that these 32 deaths, between 2011 and 2018, included babies even younger than the 3-month threshold cited in the initial warning, which is alarming. The cause of death listed for some babies was asphyxia, or the inability to breathe caused by the babies' position. AAP urges parents of children of all ages to immediately stop using the Rock'n Play. "We cannot put any more children's lives at risk by

keeping these dangerous products on the shelves," said Rachel Moon, MD, FAAP, chair of the AAP Task Force on SIDS. "The Rock'n Play inclined sleeper should be removed from the market immediately. It does not meet the AAP's recommendations for a safe sleep environment for any baby. Infants should always sleep on their back, on a separate, flat and firm sleep surface without any bumpers or bedding." The AAP does not recommend inclined sleep products like the Rock'n Play, or any other products for sleep that require restraining a baby.

26. Consumer Report's finding that babies younger than three months are also at risk in the Rock'n-Play, and the AAP's exhortation that inclined sleepers which require restraining a baby (like the Rock'n-Play) are not safe, contradicted Fisher's and Mattel's April 5, 2019 announcements that the cause of the reported infant deaths was the fault of caregivers who used the Rock'n-Play for infants older than three months and/or did not use restraints.

27. Finally, on April 12, 2019, after the deaths of at least 32 infants were known to Fisher and Mattel, hundreds more were injured, at least 4.7 million infants were exposed to risk of death and injury, and years after the most respected association of pediatricians in the U.S., as well as a multitude of other sources, warned them of the risk, Fisher and Mattel were forced to recall all Rock'n-Play (the "Recall"). The title of the Recall notice is, "Fisher Recalls [Rock'n-Play] Due to Reports of Deaths." The announcement states: "Infant fatalities have occurred in [Rock'n-Play], after the infants rolled from their back to their stomach or side while unrestrained, or under other circumstances." It advises that "[c]onsumers should immediately stop using the product."

28. Despite voluntarily recalling the product on April 12, 2019, the general manager of Fisher again claimed the product was safe, stating: "We stand by the safety of our products. However, due to reported incidents in which the product was used contrary to the safety warnings and instructions, we have decided to conduct a voluntary recall of the [Rock'n-Play] in partnership with the [CPSC]."

29. Although Fisher and Mattel in that statement attempt to blame all deaths and injuries on caregivers using the product improperly, the product can cause death and injury even when used exactly as instructed. Thus, long before the Recall, the AAP and numerous consumer groups wrote to the CPSC expressing concern about a prior announcement that "makes it seem, incorrectly, that inclined sleep products are safe if used with restraints." As reported by Consumer Reports, "[t]he AAP … doesn't recommend for routine use sleeping devices that require the use of restraints because a baby could roll or turn into an unsafe position and be incapable of moving, leading to suffocation or strangulation."

30. While Fisher's and Mattel's April 5, 2019 press release stated that there were ten infant deaths in the Rock'n-Play since 2015 and warned that the product should not be used for infants older than three months, in the April 12, 2019 Recall, Fisher and Mattel admitted that more than 30 babies had died in the Rock'n-Play since 2009 and directed consumers to stop using the product for their babies regardless of how old they were.

31. After the Recall, consumer advocates expressed concern that the Recall program was too restrictive and caused confusion. A Washington Post article about the Recall quotes Rachel Weintraub, General Counsel of the Consumer Federation of America, as stating that the Recall is "problematic." It also quotes the Executive Director of Kids in Danger as expressing concern that the sliding scale of reimbursement under the Recall will "discourage participation." Indeed, among other things, the Recall unfairly limits full reimbursement to parents who have only owned the product for six months or less; for that category of customers, provides for reimbursement of tax only if they or the original purchaser kept the receipt; and for parents who owned the product for six months or more, provides a voucher "for a Fisher product to be selected from a list of products to be provided by Fisher Price," which "will be determined by the original date of purchase of the product."

32. On October 16, 2019, the CPSC issued a draft supplemental notice of rulemaking regarding inclined infant sleep products which "proposes to limit the seat back angle for sleep to 10 degrees or less, and to change the scope of the standard to cover products intended for infant sleep that are not already addressed by another standard." This would have the effect of banning the Rock'n-Play because it places the infant to sleep at a 30-degree angle. The Supplemental Notice of Rulemaking notes that 59 infant fatalities were reported to the CPSC with inclined infant sleep products, a product category overwhelmingly dominated by the Rock'n-Play.

33. Had parents been aware of the potentially fatal dangers posed by the Rock'n-Play, or the risk of serious injury, they would not have purchased or used the product. Fisher's and Mattel's false and misleading marketing of this dangerous product and knowing failure to disclose the grave risks of its use as a sleeper, including for overnight or prolonged sleep, allowed Fisher and Mattel to reap vast profits at the expense of consumers who erroneously believed they were giving their babies a safe place to sleep.

34. Mattel, until April 12, 2019, directly and/or through Fisher, designed, manufactured, distributed, marketed, advertised, labeled, and sold Rock'n-Plays in all 50 states.

35. Mattel shares overall responsibility for the safety of Fisher products, including the Rock'n-Play. All recall and safety alerts and customer service for both Fisher and Mattel products are found on the Mattel website. Mattel has at all times had significant involvement in and responsibility for the wrongful conduct alleged herein. Indeed, Fisher and Mattel have stated that the Rock'n-Play was developed by "Mattel, through its Fisher subsidiary."

36. Mattel owns Fisher and includes its results in its filings with the SEC. For example, Mattel's 10-Q for the period ending July 30, 2019 contains a statement about litigation pending against Mattel and Fisher concerning the Rock'n-Play, including it among contingencies that could impact Mattel's financial results. On its

financial filings, it describes Fisher as a "brand," part of the "Infant, Toddler, and Preschool Segment" represented in Mattel's gross sales.

37. Mattel, at all relevant times, had senior executives with control over, involvement in and oversight of Fisher, with titles such as "Executive Vice President - Fisher Global Brands," and "Executive Vice President - Fisher Global Brand Marketing." For example, Bryan Brown, Mattel's Vice President of Quality, Design and North American Manufacturing, held a variety of positions in which he had oversight of and involvement in addressing issues concerning Rock'n-Play.

38. In 2013, Mattel moved 100 Fisher employees from Fisher's headquarters in East Aurora to Mattel's headquarters in El Segundo. Some Fisher executives are located in and primarily work from California. As a former Fisher executive stated in Buffalo Business First, "much of the leadership has been shifted to El Segundo, the Los Angeles suburb where Mattel is located." The instruction manuals for the Rock'n-Play were posted on Mattel's website.

39. Mattel bears responsibility for failing to timely recall Rock'n-Play. Mattel had direct involvement in all recalls of Fisher products. When the Recall of all 4.7 million Rock'n-Play finally occurred, the announcement of the Recall on the CPSC's website stated the consumer contact for information about the Recall was, "Fisher online at www.service.mattel.com." The terms of the Recall are set forth on Mattel's website.

40. Dirt is a retailer in the secondary market, which means it purchases goods from traditional retailers who have had a hard time selling those items through normal channels of distribution due to errors in purchasing, increased competition, or down economies. It is the largest buyer of insurance claims in the United States. It purchases liquidations, customer returns, overstocks, out of season goods, bankruptcies, and closeouts from manufacturers, distributors, and other retailers from throughout the country.

41. Dirt offers leading private label and brand name merchandise for 40% to 90% off regular retail prices. It has over 100 company-owned stores across eight states, including the Pensacola store that sold the Rock'n-Play at issue in this case. The CPSC has resources on its website to help retailers know what products have been recalled.

42. On January 23, 2021, a Florida consumer and friend of Paris's foster parents saw the Rock'n-Play from one of Dirt's stores, in Escambia County at 8102 North Davis Highway, Pensacola, Florida 32514. The friend called Paris's foster parents and they decided to purchase it. The Rock'n-Play purchased was new and in an unopened box. The Rock'n-Play was given to Paris's foster parents to be used to help Paris sleep. The foster parents reimbursed the friend for the purchase.

43. Dirt knew or should have known about the recall but knowingly and/or willfully sold it anyway.

44. Three months later, on April 21, 2021, Paris was discovered deceased in the Rock'n-Play. An autopsy confirmed the cause of death as positional asphyxia. She was five-and-a-half months old.

45. On January 9, 2023, because of their efforts to notify the public and sellers were so inadequate, Fisher and Mattel were again forced by the CPSC to announce another recall of the same 4.7 million units.

<u>Count One -- Strict Liability</u>

46. Plaintiffs adopt and incorporate the allegations in the preceding paragraphs as if fully set forth herein, and further allege as follows.

47. This is a civil action for damages brought because of the death of Paris Browder pursuant to the Florida Wrongful Death Act, Fla. Stat. §§ 768.16, et seq. and Florida substantive law. Leuchtman brings this count as personal representative of the estate of Paris Browder and seeks to recover for the benefit of Paris's estate and survivors, including her parents and sister, all damages as specified in the Act, caused by the injury resulting in death.

48. Defendants are engaged in the for-profit business of designing, manufacturing, assembling, testing, inspecting, marketing, distributing, and/or selling Rock'n-Plays, including the State of Florida, for use by individual consumers, including Paris. Defendants designed, manufactured, assembled, tested, inspected, marketed, distributed, and/or sold the Rock'n-Play.

49. The Rock'n-Play was defective and unreasonably dangerous because it was defectively designed. It was foreseeable to Defendants that users -- babies -- would die from positional asphyxia while sleeping in the Rock'n-Plays. Defendants continued to sell the product knowing of this unreasonable danger.

50. The Rock'n-Play was also defective and unreasonably dangerous because there were no warnings on the Rock'n-Play or in the instructions accompanying it that adequately warned consumers and users about the prevalence and likelihood of infant death. To make matters worse, Defendants' warnings, instructions, and sales materials and packaging encouraged parents to allow their babies to have prolonged sleep, including overnight sleep, in Rock'n-Plays.

51. These defects were present in the Rock'n-Play when it was manufactured, assembled, and sold by Defendants. The Rock'n-Play was expected to, and did, reach Paris without substantial change in its condition. The Rock'n-Play was not altered or changed in any material way and remained in substantially the same condition when Paris died in it on April 21, 2021, as when it left the possession of Defendants.

52. Paris and her foster parents used the Rock'n-Play in a way that was foreseeable to Defendants.

53. The Rock'n-Play, as designed, manufactured, assembled, tested, inspected, marketed, distributed, and/or sold by Defendants was defective and unreasonably dangerous in the following respects:

(a) the risk of severe and life-threatening injury associated with defects in the Rock'n-Play rendered the product inherently dangerous in its design, outweighing any utility it may have had;

(b) Defendants knew that the Rock'n-Play was and is a dangerously defective product that poses an unacceptable risk to the health and lives of the unknowing consumer public at large; and

(c) the Rock'n-Play lacked appropriate warnings and instructions against using it for prolonged sleep, including overnight sleep.

54. When the Rock'n-Play was designed, manufactured, and sold by Defendants, there were safer alternative designs and warnings/instructions that would have alleviated the above defects and prevented the risk of injury without substantially impairing the utility of the Rock'n-Play. These and other safer alternative designs and warnings/instructions were economically and technologically feasible when the Rock'n-Play left the control of Defendants under then-existing or reasonably achievable scientific knowledge and common sense.

55. The defective and unreasonably dangerous condition of the Rock'n-Play caused the death of Paris and directly and proximately injured all Plaintiffs as set forth above. Paris's death, and these injuries and damages, would have been prevented if the Rock'n-Play had not been defective and unreasonably dangerous.

Paris would have been entitled to maintain an action and recover damages against Defendants for her injuries if death had not ensued.

Count Two -- Negligence

56. Plaintiffs adopt and incorporate the allegations in the preceding paragraphs as if fully set forth herein, and further allege as follows.

57. This is a civil action for damages brought because of the death of Paris Browder pursuant to the Florida Wrongful Death Act, Fla. Stat. §§ 768.16, et seq. and Florida substantive law. Leuchtman brings this count as personal representative of the estate of Paris Browder and seeks to recover for the benefit of Paris's estate and survivors, including her parents and sister, all damages as specified in the Act, caused by the injury resulting in death.

58. The standard of care imposed a duty on Defendants to design, manufacture, assemble, test, inspect, market, advertise, label, distribute, sell, and if necessary recall, the Rock'n-Play in a reasonably safe manner. Defendants also owed a duty to detect and address major defects in a timely manner. Defendants and their employees breached that duty by negligently:

(a) designing, manufacturing, and selling the Rock'n-Play when it knew that they were unreasonably dangerous and unsafe for use;

(b) failing to warn consumers and users about the frequency and likelihood of infant death from prolonged sleep, including overnight sleep;

(c) failing to properly recall the Rock'n-Play, including during the April 2019 recall to engage in even the most basic efforts to remove the products from the stream of commerce and ensure that families were no longer using them;

(d) knowing or having reason to know that the Rock'n-Play was dangerous for its intended use;

(e) failing to take proper precautions to make its infant Rock'n-Plays safe, despite knowledge of the aforementioned dangers;

(f) violating 15 U.S.C. § 2068(a)(1)-(2) and supporting CFR regulations; and

(g) otherwise being negligent as will be revealed through discovery.

59. The negligence of Defendants and their employees caused the death of Paris and directly and proximately injured the Plaintiffs as set forth above. Paris's death, and these injuries and damages, would have been prevented if Defendants had not acted with negligence. Paris would have been entitled to maintain an action and recover damages against Defendants for her injuries if death had not ensued.

60. Defendants are vicariously liable for the torts committed by their employees in the course and scope of their employment under the doctrine of respondeat superior.

<u>Count Three -- Breach of Implied Warranties</u>

61. Plaintiffs adopt and incorporate the allegations in the preceding paragraphs as if fully set forth herein, and further allege as follows.

62. This is a civil action for damages brought because of the death of Paris Browder pursuant to the provisions of the Florida Wrongful Death Act, Fla. Stat. §§ 768.16, et seq. and the Florida substantive law. Leuchtman brings this count as personal representative of the estate of Paris Browder and seeks to recover for the benefit of Paris's estate and survivors, including her parents and sister, all damages as specified in the Act, caused by the injury resulting in death.

63. The Rock'n-Play is a "good" and Defendants are "merchants" as defined in Florida's codification of the Uniform Commercial Code. Fla. Stat. Ann. §§ 672.104(1), 672.105(1). Defendants impliedly warranted that the Rock'n-Play was (a) reasonably fit and suitable for the purposes for which it was intended to be used, (b) free of defects, and (c) of merchantable quality. Defendants breached said warranties because the Rock'n-Play was not (a) reasonably fit or suitable for the purposes for which it was intended to be used, (b) free of defects, and (c) of merchantable quality for the reason stated above.

64. Pursuant to Fla. Stat. Ann. § 672.314, a warranty that the Rock'n-Play was in merchantable condition was implied by law in the sale of the product. Defendants impliedly warranted that the Rock'n-Play was of a merchantable quality.

65. Pursuant to Fla. Stat. Ann. § 672.315, a warranty that the Rock'n-Play was appropriate for safe infant sleep, including prolonged or overnight sleep, was implied by law.

66. By placing the Rock'n-Play in the stream of commerce, Defendants impliedly warranted that the Rock'n-Play was safe, and that all claims in their advertising and marketing of the Rock'n-Play were true, including that the Rock'n-Play was safe for infant sleep, including prolonged or overnight sleep.

67. As merchants, Defendants knew that consumers relied upon Defendants to design, manufacture, distribute, market, advertise, label, and sell products that are safe and not deceptively marketed, and in fact members of the public, who reasonably relied upon the skill and judgment of Defendants and upon said implied warranties in purchasing and/or owning the Rock'n-Play.

68. Defendants breached the implied warranty of merchantability because a "sleeper," to be merchantable, must provide a suitable and safe sleeping environment, including for prolonged periods or overnight, and, for the reasons stated above, the Rock'n-Play is not safe and unfit for infant sleep.

69. The Rock'n-Play is unsafe and dangerous because it is of such a character that when used in its expected manner it is a source of death and injury to babies.

70. Paris is among those intended to be ultimate users of the Rock'n-Play.

71. At all times that Defendants warranted and sold the Rock'n-Play, they knew or should have known that their warranties were false, and yet they did not disclose the truth, or stop manufacturing or selling the Rock'n-Play, and instead

continued to issue false warranties, continued to insist the product was safe, and continued to market and sell it.

72. The Rock'n-Play was defective when Defendants delivered them to their resellers, dealers, and distributors which sold it, and the Rock'n-Play was therefore still defective when Dirt sold it to those who used it for Paris.

73. The acquisition of the Rock'n-Play that killed Paris suffices to create privity of contract; however, strict privity of contract is not required because Paris was the intended third-party beneficiary of the implied warranties.

74. Defendants' breach of warranties caused the death of Paris and directly and proximately injured the Plaintiffs as set forth above. Paris's death, and these injuries and damages, would have been prevented if Defendants had not breached their warranties. Paris would have been entitled to maintain an action and recover damages against Defendants for her injuries if death had not ensued.

<u>Count Four -- Knowing Violation of CPSC Rules and Orders</u>

75. Plaintiffs adopt and incorporate the allegations in the preceding paragraphs, as if fully set forth herein, and further allege as follows.

76. This is a federal civil action for damages brought because of the death of Paris Browder pursuant to § 2072 of the CPSA. Leuchtman brings this count as personal representative of the estate of Paris Browder and seeks to recover for the benefit of Paris's estate and survivors, including her parents and sister, all damages

as specified in the Act, caused by the injury resulting in death. In addition, and in the alternative, because the CPSA and federal case law is not clear as to whether Paris's parents and sister can or should or must be joined as party plaintiffs on this claim, Paris's parents and sister also bring their claims as party plaintiffs in their own right.

77. Defendants knowingly violated CPSC rules and orders as set forth above, including, but not limited to 15 U.S.C. § 2068(a)(1)-(2) and supporting CFR regulations, which prohibit the sale of a product regulated by the CPSA or the CPSC and/or was subject to corrective action taken by the manufacturer in consultation with the CPSC.

78. Defendants' violation of CPSA rules and orders caused the death of Paris and directly and proximately injured and Plaintiffs as set forth above. Paris's death, and these injuries and damages, would have been prevented if Defendants had not sold the Rock'n-Play in violation of the CPSA. Paris would have been entitled to maintain an action and recover damages against Defendants for her injuries if death had not ensued.

Relief Requested

79. Plaintiffs pray for judgment in their favor and against Defendants for the harm caused by Defendants' wrongful conduct as follows: (1) that process issue according to law, (2) that a jury be empaneled to hear this cause, (3) that the Court

enter judgment consistent with the verdict, and (4) that the judgment include (a) actual compensatory damages for the benefit of the Plaintiffs according to proof as decided by the jury, (b) punitive damages according to the proof as decided by the jury to punish the Defendants and deter them and others, (c) attorneys' fees and expert witness fees as decided by the Court, (d) court costs and interest from the date of the judgment as decided by the Court, and (e) all other relief deemed just and proper as decided by the Court.

Jury Demand

80. Plaintiffs respectfully demand a trial by struck jury on all counts and all triable issues of fact, including the amount of damages.

Respectfully submitted,

 /s/ Chris Klotz
Eric Stevenson (Fla. Bar No. 144495)
Chris Klotz (Fla. Bar No. 47060)
Attorneys for All Plaintiffs

OF COUNSEL:
STEVENSON KLOTZ L.L.P.
510 East Zaragoza Street
Pensacola, Florida 32502
(850) 444-0000
eric@stevensonklotz.com
chris@stevensonklotz.com

<u>THESE ATTORNEYS WILL SEEK ADMISSION PRO HAC VICE:</u>
Wm. Reeves Rip Andrews | Richard J. Riley
MARSH | RICKARD | BRYAN
800 Shades Creek Parkway; Suite 600-D
Birmingham, Alabama 35209
(205)879-1981
ripandrews@mrblaw.com
rriley@mrblaw.com

<u>REQUEST FOR SUMMONSES AND SERVICE</u>

Plaintiffs request the Clerk immediately issue a summonses for the following defendants to be served at the following addresses.

      FISHER-PRICE INC.
      c/o The Corporation Trust Company, its registered agent
      Corporation Trust Center
      1209 Orange Street
      Wilmington, Delaware 19801

      MATTEL INC.
      c/o The Corporation Trust Company, its registered agent
      Corporation Trust Center
      1209 Orange Street
      Wilmington, Delaware 19801

      DIRT CHEAP L.L.C.
      c/o C.T. Corporation System, its registered agent
      645 Lakeland Drive East Dr., Suite 101
      Flowood, Mississippi 39232

                 /s/ Chris Klotz
                 Chris Klotz